Good morning, Your Honors, and thank you very much for accepting my request to move me further up in the hearing this morning. I'd like to address two issues principally. Keep your voice up, would you please? Yes. The first issue is the release. This release arises out of a contract between CBS Outdoor and my clients, a small competitor, Advertising Display Systems, Ray Rudy, the That release contained an exculpation from liability clause drafted as broadly as it can be drafted. It's our contention that that clause is unenforceable under Civil Code Section 1668, which states that all contracts which have as their object, directly or indirectly, to exempt anyone from responsibility for his own fraud or willful injury to the person or property of another, or violation of law, whether willful or negligent, are against the policy of the law. In this case, we have statutory violations which are intentional and in violation of the policy of law. The defense argues Tunkel v. The Regents of University of California. Counsel, would you kindly raise your voice so that we can hear you clearly? Yes, Your Honor. I know you're reading, and it's difficult to do, but you're missing effect. The defense relies upon Tunkel for its position that the public policy is not invoked simply because there are two competitors who are the parties to the contract. We submit that the fact that the parties are competitors has no bearing on Tunkel. Tunkel is only applicable to negligence claims. It has no application, as we read the cases, to intentional conduct or statutory violations. That's the matter. That's before us. Was the release the parties to the release were your client and CBS, is that right? That's correct, Your Honor. So there's another defendant who is not a party? That's right. So even if you so if you even assuming that you're correct on the release, without deciding that you are, you still have to show in both cases that with respect to both defendants that you had some kind of claim. That's correct. The nuisance claims apply to both CBS and to Clear Channel. The release only applies to CBS. We've cited Capri v. L.A. Fitness Interns and Health Net of California for the proposition that Section 1668 prohibits the enforcement of any contractual clause that seeks to exempt a party from liability for violations of statutory and regulatory law, and that is precisely the violations of law that are at issue in this case. And we see that. But you have to be an intended beneficiary of the statute in order to invoke that release exception, do you not? I believe that we are intended beneficiaries of the statute. I thought the statute was to benefit the public, not any private individuals. It is not an anti-competitive statute. It is an anti-aesthetic statute. Well, Your Honor, under that reading, a powerful enough party could insert these clauses into a contract and go about their business of violating the law and rest upon the comfort that the party with whom they've entered this contract doesn't have the resources or simply will not. Is it your claim that this release was procured by duress, fraud, or other overreaching? No, that's not our claim. Our claim is that it's void of initio. To the extent that any civil harm has occurred as a result of its inclusion in the contract, there's a civil remedy for it. There could be fraud, for example, if that's the allegation and that's the proof. There's grounds for rescission if that's the case. If it's not fraud, but a state of mind that arose after the contract was entered, perhaps a breach of the contract, in which case there's a remedy for that. Okay. Well, you've used almost a third of your time, and unless my colleagues have any questions with respect to the release, I suggest you go on to discuss your claims on the merits for the releases. I will. Thank you. All right. Now as to against both CBS and Clear Channel, I believe with due respect to the lower court, that the concept of physical interference was wrapped into the concept of special injury in the public nuisance analysis. I think that the law under public nuisance is different substantially from the law under private nuisance. Under the public nuisance, in this case we have a nuisance per se. We have met the standing requirement. Under some of the cases that have been cited, the courts analyzed whether standing has been met or not met. In those cases, they were not nuisances per se where they are here. Now, under the public nuisance analysis, we look to no California authority on the point that either side can point to. So in the absence of California authority, we look to the restatement. And the restatement of torts section 821C-H clearly says that pecuniary loss to business is a significant loss to qualify for a private claim for public nuisance. In this case, we recite Burgess v. MV Tamano, 370 Federal SEP 247, in which the court did not require a physical injury. In that case, it was commercial fishermen making a private claim for the loss of their ability to make a living on the waters where the waters were We also cite Starlink v. Corn Products Liability, 212 Federal SEP 2nd 828. In that case, it was genetically modified corn, which was the subject of a public nuisance to the public at large for the freedom from being contaminated from food. And in that particular case, the court allowed recovery under 821C-H of the restatement for the impact of that contaminated corn on the depressed pricing of corn. Now, in this case, violation of the law in this case is the proliferation of illegal signs. We are required to make a private claim to demonstrate a harm different in kind, not simply degree, from that suffered by the public at large. The proliferation of illegal signs is visual blight. It's sight contamination. As a result of the sight contamination, the public suffers visual, aesthetic harm and safety concerns. As a result of the same sight contamination, my clients suffer a commercial harm, a commercial harm that's recognized under 821-C. Haven't you been given leave to amend by the district court to state your intentional interference with economic relations against Clear Channel? In fact, we have been granted that leave. We didn't. We could not make, in my opinion, the showing that the court was going to allow us to amend on, and that was to demonstrate a specific relationship that had been intervened. So you refused to amend? Well, Your Honor, we weren't granted leave to amend on the point that I felt it was most appropriate to amend on, which was public nuisance. I understand. And in that case, Your Honor, the special master, I believe, improperly read the complaint because he acknowledged in the report on the motion for granting leave to amend, he acknowledged that the lower court had not considered the public nuisance special injury argument and observed that the lower court had perhaps wrapped the concept of classic nuisance into the special injury analysis, the one that I've just pointed out. He observed that there could be a situation, although there's no case on point for it, that a public injury could be alleged if you could demonstrate a harm different from that suffered by the public where that special private harm did not have to do with a physical injury, and that's exactly the case here. The special master characterized it at page 0162 of the record in page 16 of his report on the recommendations you grant leave to amend. The special master finds that the amendment to add a nuisance is a difficult and interesting issue with no clear answer, which is another way of saying there's no California case on the point. And I submit that where there's no California case on the point, you go to the restatement of torts, as did the court in Illinois in the Ray Starbucks products case, and the court in Burgess. You go to the restatement of torts, and where you can't find a local case that supports the position, you apply the restatement of torts to the facts of your situation. Well, let me ask you this. The quality of the defendant's violation that creates the nuisance is visual blight, you said. Is that correct? Well, it has two. That's the result of the violation. Violation is the proliferation of illegal signs. It has two effects. One is visual blight. There are too many signs, and the thing that makes it a nuisance is that it creates visual blight. There are too many signs, and the signs where they're particularly located creates a different and more particular type of visual blight. For example, if you're advertising with Honda, and you've got the Honda ad on the illegal sign across the street, Honda's not going to put an ad on your sign, which is legal, because they've already got a sign in that demographic market. Honda's one of many, many examples I could point to. But there's a quite particular harm that exists that has a physical nexus with the actual location of these signs. So the visual blight is both general and specific. Well, let us suppose that instead of having signs, more signs than were allowed, they had exactly the number of signs that the ordinance would allow totally for the county and city of San Francisco. Wouldn't your injury be exactly the same, even if there were no violation and therefore no nuisance? Well, no. It wouldn't be the same, because You wouldn't put up any signs. Well, these signs are already existing, all right? And the ability to construct new signs is really irrelevant. We're talking about a body of signs that we already have leases with or other leases that we might enter with, other legal operators of signs. But if those signs, the prospective ones that we might enter into a lease with and our existing ones, are placed across the street from an illegal sign, within the current existing inventory of signs, the harm is the same. It's not a question of can we expand our business and get more signs, and we cannot. Because of the prohibition against signs, we're talking about the current body of inventory as it exists today. Within that body is a proliferation of signs generally. That has a different kind of economic impact. Those signs are packaged with other signs and sold with the sign across the street from our sign, which is legal. So it's this body of illegal signs across the city in addition to the general body of signs, the ones directly across the street. So if you already have signs, what is your injury, that you get less revenue from your signs? Is that your injury? We get less revenue. That's your injury, isn't it? It is. Yes. And the less injury comes because there's more competition. No. The less injury because we can't use the sign at all. The sign is blank because we can't put advertising copy on it because there's an illegal sign that's directly across the street that has consumed the revenue dedicated to that market for signs. What do you mean by you can't put anything on it? It's forbidden by the ordinance? No. As a matter of the commercial operation of the advertiser's budget, there's only so much money dedicated to it. Okay. So there's no market for it. It's a competition. Because of the sign across the street. Because of the illegal sign across the street. It consumes the revenue. That's correct. Well, it would be true whether it was an illegal sign or a legal sign, wouldn't it? If there was a sign across the street, then it would, then you wouldn't, you wouldn't be able to get any revenue for putting up another sign. Not necessarily true. The total volume of illegal signs is so great that it consumes the revenue dedicated to the San Francisco market. If there were fewer illegal signs, we're talking a magnitude of 40 percent. Aren't you assuming a static amount of demand? You know, that just. So much money only for advertising in San Francisco? You wouldn't need the ordinance. I think that that's the testimony from the people in that business that dedicate budgets, budget allocations to the San Francisco market. To me, it just doesn't seem that that's the type of injury the ordinance is aimed at preventing. In other words, that, you know, another billboard company's revenue is reduced. Well, that's exactly the type of injury a private claimant under a public nuisance theory must advance. It has to be different injury than that suffered by the public. It has to be of the same type of harm that is created by the nuisance. The injury itself has to be some special kind. I can understand if the sign is supposed to protect, if the ordinance is supposed to protect against blight, and so if someone has a, or obstructions of vision, and somebody has a property where the sign, the too big sign is blocking their view of the San Francisco Bay, I can see how they might have a special kind of injury. But I don't see how economic injury is part of the same kind of harm created by the nuisance that the nuisance was intended, nuisance statute was intended to prevent. And, Your Honor, with due respect, I don't think the restatement cuts it that narrowly. The restatement allows for pecuniary harm to business as a consequence that's not part of the nuisance theory, that's at 821-CH of the restatement. Well, what is it, what, is there any case where the nuisance is aesthetic and the harm has been recognized as economic? Is there any, I can't find, I haven't been able to find it. I've not found one, but I think a. The restatement second has been around for 50 years. I think a plate, well, I think that the point made in the In re Starkest case and the Burgess case is if there is no such law, then you turn to the restatement for the application of the law generally to the facts in your particular case. And the Burgess case is instructive, I think, because in that case, the fishermen were allowed to recover, but those who were operating businesses on the shore were not. And there's a distinction between the two. If I was here representing an advertiser and I wanted to put ad copy on my client's signs but couldn't because of the nuisance, I would be akin to those operating the beach shore businesses. That's different. I'm the fisherman in that case. Okay, you've more than used your time. I think we have to change the position. Thank you. Good morning, Your Honor. Alison Davis on behalf of CBS, one of the appellees here. I will address the release. My co-counsel, Mr. Leonis, represents Mr. Roach, an employee of CBS, and joins in the argument regarding the release as the release plainly covers both CBS and Mr. Roach, and I'll speak for just about six minutes. Mr. Cardozo will address the nuisance causes of action, and we will join in his argument. Thank you. I wish to make three brief points regarding the release. One, the contract and the release themselves are clear, unambiguous, and they bar the action. Two- What about the statute? Is the statute clear? We'll go to the statute, Your Honor. That's my next point. The purpose of 1668 is to prevent unfair, compulsory risk shifting. And that isn't needed here. Let me just go right to that argument, since you asked that question. 1668, the purpose of it is to make an even playing field, is to prevent someone from taking unfair advantage and shifting a risk that wasn't bargained for. If we look at the cases, the Gavin case, Gavin v. Blank's case- I guess you get that from some of the cases, but all the cases don't adopt that theory, do they? Actually, they do, in a way. And let me try to walk through them and see if I can get you to agree with me there. The Gavin case says that we must analyze the underlying transaction that occurs. So we can look at the cases, the pure negligence cases, or the Tunkel cases. And Capri, which is actually also a negligence per se case, applies that's an adhesion contract in a gym with a pool. Health Net was the superior bargaining power of DHS. The intentional injury in the Gavin case. Future negligence in a hospital case with Tunkel. Negligence in the camp for kids with special needs in the Janeway case. And then the negligence per se case, as Judge Baird pointed out, requires that the injury was the type of injury that the statute was designed to prevent. And that's the Capri case. You need to clean up around your pool so you don't have a slip and fall. The Hannah versus Letterman case that said if the sprinklers had been done according to the code, they would have had less damage in the house. The alleged planning code violation, on the other hand, the purpose is safety and aesthetics, not protection of ADS's profit. Any violation of that is not a proximate cause of ADS's losses. Let's get to the next point about 1668. As the special master pointed out, Judge Lenz pointed out, where a contract's negotiated between competitors. And here was a sale of seven billboards for $2 million. And as part of that contract, the parties negotiated the release and specifically pointed to a clear channel case. And said, and this was just a valid limitation of liability, not some complete exemption of responsibility. It said, we don't want to be sued, like you sued, clear channel in that case. And they were very specific in the release. They talked about the maintenance operation permitting. It tracks the complaint. It said, in this situation, if we're going to sell, buy, give you $2 million and buy seven of your billboards, we don't want to be sued. Clear on the face of the contract. It's not the kind of situation that you see in the 1668 cases, where there's a complete exemption of liability. This is more like a settlement case. This is more like a settlement, like in the Jefferson case that we cite in our brief, or the Winnett. This is where the parties agree not to go into litigation after some prolonged negotiation. Here you're seeing the sale negotiation and the release coupled together. The only case between business entities in the 1668 arena is the Health Net case. And in that case, arguably, the Tunkel Factor applied. There was a public interest. But even if you ignore that, DHS had a blanket, no liability exculpatory clause here. Here we have a very specific, narrow area. It's more like the CASA case or the Appalachian Insurance case. And in the absence of 1668, the contract is plain and clear. And ADS admits on page 15 of its opening brief that the release bars all claims against CBS and Roche absent the application of 1668. And the specific reference to the clear channel suit shows knowledge, specific knowledge, specific intent. It's a known factor. And the last point I'll make is that which was made by Judge Lynch in the special master's recommendation and report was that this controversy or whatever you want to, what the release covers was stagnant as of March 2002. The release was December 2003. Prop G in March of 2002 limited the number of billboards. So there's no future violation here either. Thank you very much. Thank you. Good morning, Your Honors. Ray Cardoso. And let me go right to the flaw in the public nuisance cause of action. The panel's already touched on it. As Judge Schroeder pointed out, the harm that's alleged to be this, must, that's alleged to be the special injury, must flow from the same public rights that we're talking about. Now this has, you see this point running through every single case that all of the parties have cited to the court in their briefs. But a particularly good expression of it is in Judge Higginbotham's opinion for the Third Circuit in the Philadelphia Electric case. He points out, we find in this case no allegation or evidence that PICO suffered this harm, quote, emphasizing the right common to the general public that was the subject of interference. The public right that was interfered with was the right to pure water. PICO does not allege that it used the water of the Delaware River itself or that it was directly harmed in any way by the pollution of those waters. What is your claim as to what the public right here is under the statute? As Your Honor's pointed out, it's the interest in aesthetics and safety. And we have a clear statement of the disconnect between the public harm and the special injury alleged here in the appellant's own brief at page 29. The injury to the public at large is safety and aesthetics. The separate and distinct injury to appellants is an economic injury to its property rights, i.e., the diminution in value of its leasehold interest caused by the diversion of dedicated revenue in the mini markets. Separate injury, we can't make as much money, as Judge Tsushima pointed out. It's not an aesthetics or safety-based injury at all. The appellant is trying to misuse the requirement that the injury be different in kind but not in degree. But its very authority, the very restatement provision it relied on this morning, blows that out of the water. And here's a statement from the Burgess case, which is the lead case on which the appellant relies. Pecuniary loss to the plaintiff will be regarded as different in kind where the plaintiff has an established business making a commercial use, and here's the important part, of the public right with which the defendant interfered. In that case, the commercial fishermen and clam diggers were using the right, the public's right, to unpolluted coastal waters to run their business, it was the exact same harm as the public right. Interestingly enough, in that very case, there were some businesses that relied on the tourist trade, who also claimed nuisance, and their claims were held insufficient because they weren't using that exact same public right. Now, I don't need to go through all of the cases in the briefs. We've seen competing businesses in the gambling arena, filling station operators, popcorn stand operators, all seeking to take advantage of a regulatory violation by a competitor, all claiming their economic loss made it a special injury. And in every one of those instances, it was the disconnect between the public harm and the economic injury alleged that caused the courts to reject the claim. Well, yes, but in a sense, one can have sympathy with the concern that one huge company is using up all the signs that the public has allotted for everyone to use in the city and county of San Francisco. And one would think there might be some wiggle room for a competitor to say, look, this isn't right. What is the appropriate remedy for that? The law has plenty of wiggle room. The whole basis for the special injury requirement is that the enforcement of these public rights is ordinarily left to the appointed representatives. And we have a detailed planning code provisions that permits these contentions to be aired, and in fact, that process has been ongoing, and we've been slogging through it for a while now since this judgment's been entered. That's the preferred route. How is that going on? That's going on at the administrative level. They're reviewing the permit issues and going through it. We only- This is a part of the permitting process. Yes, and the briefs referred to parties had to submit detailed inventories, which permit the city to review. There's a whole administrative process there. The crucial thing is we prefer public representatives because otherwise, competitive disputes are going to be aired out, not in the marketplace where we want them, but right here in this courtroom where we don't want them, except under special circumstances where we need to hear them. Nuisance law just doesn't fit. And I want to touch on a point you made, Judge Schroeder, which is, are you aware of any case in which you had an aesthetic injury as the public harm and an economic loss? There is no case where we have this disconnect, and as you pointed out, the restatement's been around 50 years. I can assure you if Starbucks could come into court because a Pete's opened up across the street and there was some perceived regulatory violation, you would see this theory in spades. The fact that there's no case involving this kind of a disconnect speaks volumes and tells you that the district court's decision in this case was absolutely sound. Actually, there aren't any cases much one way or the other here. I would disagree with that. If you look at Trinkle, we've got a different harm. We've got the public's interest in avoiding gambling versus the competitor's interest of, if these machines weren't there, I'd make more money. Yeah. If you look at the Moon case in Georgia, we've got the public's interest in avoiding price gouging of consumers, and we've got the filling station operator across the street saying, if they weren't doing that, I'd be making more money. No, I was just, I'm sorry, I didn't communicate very well. I was just thinking that the restatement provision hasn't had a lot of development over the years. It hasn't, but that's for a very good reason. I understand. The law of nuisance is understandably restricted. On the public nuisance side, what the law is, the rule is very clear and it's set out well in the Venuto case. We leave this to the appointed representative, unless you make a very high showing of a special injury. So in that case, even people who are claiming that their respiratory illnesses were aggravated by air pollution didn't qualify. So in light of the high bar that's set there, people just haven't tried. Business competitors usually come into court and invoke what, in fact, we saw in this case. The Sherman Act, tortious interference, those kinds of competition theories. The problem there is those competition theories are also restrictive because we want to permit competition, not allow these lawsuits. And it was only because those theories so clearly struck out, as we heard at other admission this morning, that we're trying to pound the square peg of this competition-based lawsuit into the round hole of nuisance law. And it doesn't fit, it doesn't work. The district court was absolutely correct, and the court should affirm the judgment in all respects. Does the panel have any questions? Thank you. The case just argued is submitted for decision.
judges: Schroeder, Tashima, Bea